Monroe Beaver, Sheriff, *v.* Arthur Hall *et al.*

(*Jackson.* April Term, 1919.)

HABEAS CORPUS. Conviction not vacated because of invalidity of act creating court where no objection made.

Conviction of defendants in the criminal court for Tipton county which the legislature had undertaken to create by Priv. Acts 1917, chapter 563, making county judge holding office under Acts 1905, chapter 289, as amended by Priv. Acts 1911, chapter 607, *ex officio* judge of such criminal court, will not in *habeas corpus* proceedings be held void upon ground of invalidity of the act creating such court, where defendants did not object to the validity of the proceedings; the court being at least a *de facto* court until there has been a judicial determination of its invalidity.

Acts cited and construed: Acts 1917, ch. 563; Acts 1905, ch. 289; Acts 1911, ch. 607.

Cases cited and approved: State of Tennessee v. Clint Tipton, 217 S. W. ——; Lang v. Bayonne, 15 L. R. A. (N. S.), 93; Eames v. Savage, 77 Me., 212; Soper v. Lawrence, 98 Me., 268; State v. Carroll, 38 Conn., 449; Cincinnati, W. & Z. R. Co. v. Clinton County Com'rs, 1 Ohio St., 77; The Flaucher Case, 56 N. J. Law, 244; Allison v. Corker, 67 N. J. Law, 596; State v. Pooler, 105 Me., 224; Lang v. City of Bayonne, 74 N. J. Law, 455.

Cases cited and distinguished: Norton v. Shelby County, 118 U. S., 425; In re Norton, 64 Kan., 845; State v. Bates, 22 Utah, 65; Howard v. Burke, 140 Am. St. Rep., 164; State v. Pooler, 105 Me., 231; State v. Gardner, 54 Ohio St., 33; State v. Bailey, 106 Minn., 142; Burt v. Winona & St. P. R. Co., 31 Minn., 472; Lang v. Bayonne, 74 N. J. Law, 458.

FROM SHELBY.

Beaver v. Hall.

Error to the Probate Court of Shelby County.—HON. JACOB S. GALLOWAY, Judge.

SHERROD SMITH and L. E. GWINN, for plaintiff in error.

TIPTON & TIPTON, for defendants in error.

MR. JUSTICE McKINNEY delivered the opinion of the Court.

The relators in this case were indicted, tried, and convicted in the criminal court of Tipton county, Tenn., for transporting and selling intoxicating liquor.

Said court was created by chapter 563 of the Private Acts of 1917. By said act the Criminal Court of Tipton county was given the exclusive jurisdiction of misdemeanor cases in said county.

The relators were tried in said court by a jury upon pleas of not guilty, and after conviction made the usual motions for a new trial and in arrest of judgment. These were overruled, and an appeal taken to the supreme court, which court affirmed the judgments of the criminal court, and the relators were committed to the county workhouse of said county to work out their sentence.

The office of county judge for said county was created by chapter 289 of the Acts of 1905. This act was amended by chapter 607 of the Private Acts of 1911 so as to increase the jurisdiction of the county judge; that act authorizing him to try divorce cases and to hear and determine certain misdemeanor cases transferred by consent from the circuit court of said county to its county court.

142 Tenn.—27.

By said chapter 563 of the Acts of 1917 the legislature undertook to create a criminal court for Tipton county with exclusive jurisdiction of misdemeanor cases, and the county judge was made *ex officio* judge of said criminal court.

Subsequent to their conviction and sentence in said criminal court the relators herein filed a *habeas corpus* petition before the probate judge of Shelby county, and were by him discharged from custody on the ground that said chapter 563 of the Acts of 1917 was unconstitutional, and that all proceedings thereunder or by the court organized pursuant thereto were a nullity. From that judgment the defendant, J. M. Beaver, sheriff or Tipton county, has appealed and assigned errors.

In the case of *State of Tennessee* v. *Clint Tipton*, 217 S. W., —, from said criminal court of Tipton county, we have just held that the act creating said court was unconstitutional for the reason that it imposed an Attorney General's tax of $10 upon each convicted defendant, a burden not borne by defendants convicted of like offences in the other 95 counties of the State (the general statute fixing such fee at $5), and that said act was therefore partial and discriminatory.

It is insisted by the plaintiff in error that, notwithstanding the unconstitutionality of said act, the relators cannot raise that question in this proceeding, because said criminal court was at least a *de facto* court, and that the relators by going to trial in said court upon pleas of not guilty and by appealing their cases from that court to the supreme court without objecting

at any stage of the proceedings to either the validity of the indictment or the jurisdiction of the criminal court are bound by such proceedings, and cannot challenge in a collateral proceeding the constitutionality of the act under which said court was orginized, and are estopped from assailing the legality of the judgment rendered against them.

The relators take issue on this proposition, and insist that the act creating said court was void *ab initio*, and that therefore every step taken in the case was an absolute nullity; in other words, it is insisted by the plaintiff in error that the defendants were tried and convicted in a *de facto* court, and that said proceedings are valid and binding on the relators.

On the other hand, the relators insist that there is no such thing as a *de facto* court, and the proceedings in said criminal court were an absolute nullity.

This raises a question which this court has not directly passed upon, and one upon which courts of other jurisdictions are very much at variance. Learned counsel for both sides have cited several Tennessee authorities, all of which we have carefully examined, but we find that none of them deal with the exact question here involved. Most of the cases cited from other jurisdictions do not involve the exact question which we have under consideration in this case, but counsel take the position that the principle is the same as that involving the validity of the acts of *de facto* officers. Counsel for the plaintiff in error take the position that there may be an officer *de facto* where there is no office *de jure*. On the other hand, counsel for the relators

insist that there can be no *de facto* officer where no *de jure* office exists, and, while this is not the exact question that we have for decision, we will also refer to these cases for the light they throw upon the subject.

The leading case supporting the relator's contention is that of *Norton* v. *Shelby County,* 118 U. S., 425, 6 Sup. Ct., 1121, 30 L. Ed., 176. In that case the court, speaking through Mr. Justice FIELD, said:

"But it is contended that if the act creating the board was void, and the commissioners were not officers *de jure,* they were nevertheless officers *de facto,* and that the acts of the board as a *de facto* court are binding upon the county. This contention is met by the fact that there can be no officer, either *de jure* or *de facto,* if there be no office to fill. As the act attempting to create the office of commissioner never became a law, the office never came into existence. Some persons pretended that they held the office, but the law never recognized their pretensions, nor did the supreme court of the State. Whenever such pretensions were considered in that court, they were declared to be without any legal foundation, and the commissioners were held to be usurpers.

"The doctrine which gives validity to acts of officers *de facto,* whatever defects there may be in the legality of their appointment or election, is founded upon considerations of policy and necessity, for the protection of the public and individuals whose interests may be affected thereby. Offices are created for the benefit of the public, and private parties are not permitted to inquire into the title of persons clothed with the

Beaver v. Hall.

evidence of such offices and in apparent possession of their powers and functions. For the good order and peace of society their authority is to be respected and obeyed until in some regular mode prescribed by law their title is investigated and determined. It is manifest that endless confusion would result if in every proceding before such officers their title could be called in question. But the idea of an officer implies the existence of an office which he holds. It would be a misapplication of terms to call one an officer who holds no office, and a public office can exist only by force of law. This seems to us so obvious that we should hardly feel called upon to consider any any adverse opinion on the subject but for the earnest contention of plaintiff's counsel that such existence is not essential, and that it is sufficient if the office be provided for by any legislative enactment, however invalid. Their position is that a legislative act, though unconstitutional, may in terms create an office, and nothing further than its apparent existence is necessary to give validity to the acts of its assumed incumbent. That position, although not stated in this broad form, amounts to nothing else. It is difficult to meet it by any argument beyond this statement. An unconstitutional act is not a law; it confers no rights; it imposes no duties; it affords no protection; it creates no office; it is, in legal contemplation, as inoperative as though it had never had been passed.''

Another case especially relied upon by the relators and one very much in point is *In re Norton,* 64 Kan., 845, 68 Pac., 639, 91 Am. St. Rep., 257. In that case the court says:

"While it is admitted by the respondent that the court of common pleas had no legal existence, it is contended that it was recognized by the chief executive in appointing a judge therefor, by the sheriffs of both counties, who served its processes, and by the people, who elected a judge in 1899 to preside over it, and as such court it tried many cases, and was in operation for several months, and was therefore a *de facto* court, and its judgment conclusive and unimpeachable. The argument is that the same reasoning and necessity that demand and obtain recognition by courts of the acts of *de facto* officers demand in this instance the recognition of the court of common pleas as a *de facto* court. We cannot accede to this. While there is some authority for this conclusion, and while cases may arise where it would be proper so to hold, yet mere form or color of an office should not be permitted to stand between a citizen and his liberty. There must be a reality in the existence of the court that undertakes to deprive one of liberty. In all cases where the acts of *de facto* officers have been upheld, there existed a *de jure* office. The strongest reasoning why the acts of *de facto* officers are sustained is that the office is created by the public and put in operation as part of the system of organized society, and a continued administration of the office becomes necessary to the proper adjustment of its affairs and to the perpetuity of the system. This reasoning loses force when we undertake to apply it to a *de facto* office. Such office, not having been created by the public and not having been adopted into the organized

system, never becomes a part of it, and its displacement does not disturb the harmony of the organization.''

This latter case is based upon the decision of *Norton* v. *Shelby County,* and it is so stated in the opinion.

In *State* v. *Bates,* 22 Utah, 65, 61 Pac., 905, 83 Am. St. Rep., 768, the court says: ''The respondent insists that, as the dictrict court held that it was lawful to try him before a jury of eight men, and having been so tried and convicted, and as the judgment was affirmed by the supreme court, . . . he cannot be again tried for the same offense, and invokes the doctrine of the law of the case. This position of the respondent, under the facts and circumstances, . . . cannot be regarded as sound. . . .

''A void judgment is really no judgment. It leaves the parties litigant in the same position they were in before the trial. It leaves them in exactly the same position as if no trial had taken place. Such a judgment confers authority upon no one. . . .

'' 'A void judgment . . . is in reality no judgment at all. It is a mere nullity. It is attended by none of the consequences of a valid adjudication, nor is it entitled to the respect accorded to one. It can neither affect, impair, nor create rights. As to the person against whom it professes to be rendered, it binds him in no degree whatever; it has no effect as a lien upon his property; it does not raise an estoppel against him.' . . .

''In the present case all the proceedings of the trial court after the defendant had entered his plea were

wholly void, because the court, in the absence of a lawful jury, had no jurisdiction to try the cause, and therefore its sentence and judgment were mere nullities, and the affirmance of the judgment by the supreme court could not make them valid.''

Many other cases supporting this view can be found in the notes to *Lang* v. *Bayonne* (N. J.), 15 L. R. A. (N. S.), 93. The editor of the American State Reports, in an elaborate note to *Howard* v. *Burke,* 140 Am. St. Rep., 164, after reviewing the authorities supporting the position taken by the relators in this case, says:

''There is respectable authority, however, and perhaps better reason, for the proposition that there may be an officer *de facto* where there is no office *de jure.''*

He then proceeds to enumerate some of the cases so holding, which we will quote from in order that the reasoning of those courts adhering to the *de facto* doctrine may be understood.

In *State* v. *Pooler,* 105 Me., 231, 74 Atl., 122, 24 L. R. A. (N. S.), 410, 134 Am. St. Rep., 548, the court uses this language:

''And we may say here, before proceeding to a discussion of these cases, that we are unable to discover any difference in reason for declaring an officer to be *de faxto,* whether he holds a *de facto* or *de jure* office, if he has occupied it with the usual insignia of a *de facto* officer. The authorities are in harmony that the *de facto* doctrine was invented to deal with effects, not causes. The effects only can be reached. The causes cannot. The official acts are accomplished. If the effects are alike, it is imma-

terial that the causes differ. The effects, whether from a *de jure* or *de facto* office, are alike. Hence the acts of the officer occupying either position should be declared *de facto*.

"The court is of the opinion that an office created or authorized by the legislature should be treated as *de jure,* until otherwise declared by a competent tribunal. It is certainly true that, under the great weight of authority as established by our own court, the presumption in favor of the constitutionality of a statute is so binding that the public and individuals are bound to treat it as valid. Hence it follows that the public and individuals are compelled, by judical construction, to assume toward a legislative enactment, precisely the same attitude, whether it be constitutional or unconstitutional. And it also appears that the very object of introducing the *de facto* doctrine is to protect the public and individual in dealing with a public officer who assumes to occupy an office and whose authority they are bound to respect. These are precisely the circumstances involved in the case before us. To the public and the individual the special attorney was the attorney for the State to the extent of his powers. He was so regarded by the executive and legislative departments of the State. He was so recognized by the courts. He compelled the public and the individual to acknowledge his authority. The people relied upon him to enforce the law. Individual liberty was obliged to submit to the administration of his office. Judicial notice of their own records show that fines have been imposed and imprisonment inflicted by the courts

upon prosecutions from his office. If it is possible to find a case presenting stronger reasons for applying the *de facto* doctrine, we have been unable to discover it. Can it be possible that an individual who has been indicted under precisely the same conditions in which the indictment before us was found, if tried, convicted, and sentenced, cannot plead that he has once been put in jeopardy? The very object of the *de facto* doctrine is to say that he could so plead and be protected from any further prosecution on the ground that he had a right to regard the office, the officer, and his administration of the office as legal. And it should be here further observed that the *de facto* doctrine has been applied, on the ground that the public and the individual had a right to presume the legality of officials acts. But here the public and individual had no choice, but were compelled to recognize the office and the officer. Under the circumstances of this case we do not hesitate to declare that the office of special attorney should be regarded as *de jure* until otherwise declared, and not as invalid *ab initio*. Not only upon reason, but upon authority, this should be done. A fair analysis of the rule laid down in *Eames* v. *Savage,* 77 Me., 212, 52 Am. Rep., 751, *Soper* v. *Lawrence,* 98 Me., 268, 99 Am. St. Rep., 397, 56 Atl., 908 and *State* v. *Carroll,* 38 Conn., 449, 9 Am. Rep., 409 sustains this conclusion. The weight of authority also supports it, as a brief analysis of the two leading opposing opinions referred to will sufficiently show.''

In *State* v. *Gardner,* 54 Ohio St., 33, 42 N. E., 1000, 31 L. R. A., 662, the court says:

Beaver v. Hall.

"We think the principle of public policy declared by the English courts three centuries ago, which gave validity to the official acts of persons who intruded themselves into an office to which they had not been legally appointed, is as applicable to the conditions now presented as they were to the conditions that then confronted the English judiciary. We are not required to find a name by which officers are to be known, who have acted under a statute that has subsequently been declared unconstitutional, though we think such officers might aptly be called '*de facto* officers.' They actually perform official acts authorized by a statute solemnly enacted by the lawmaking department of the government. Such a statute is presumed to be constitutional. *Cincinnati, W. & Z. R. Co.* v. *Clinton County Com'rs,* 1 Ohio St., 77. The unbroken current of authority supports this proposition.

"Courts in the practical administration of justice should regard the substance of things and deal with conditions as they actually exist. Here are grave and important official acts actually performed by virtue of an office, created under the provisions of a statute regularly enacted by that branch of the government to which the power to make law has been delegated by the Constitution; there is a clearly established legal presumption of its validity. The public in its organized capacity, as well as private citizens, has acquiesced in and submitted to their authority. Such circumstances, the majority of the court are of opinion, are sufficient to give such color to their title as to make them *de facto* officers; but, whether they fall within the previously

existing definition of such officers or not, their official acts thus performed fall within the protection of that principle of public policy which defends them against collateral attack, and that therefore the question of the constitutionality of the statute in question was not before the court of common pleas."

And on page 38 of 54 Ohio St., on page 1002 of 42 N. E., on page 663 of 31 L. R. A., in said opinion, the court quotes from Judge VAN VLEET on collateral attack as follows:

"If it is necessary, in order to guard the rights of the public, to hold the acts of an actual, although unlawful, incumbent of a judicial office valid, as being done by an officer *de facto,* then *a fortiori* is it necessary to hold an actual judicial tribunal, erected under the forms of law, sustained by the power of the State, and settling rights and titles, a tribunal *de facto?*"

And on page 46 of 54 Ohio St., on page 1004 of 42 N. E., on page 665 of 31 L. R. A., the court further said:

"It is not here assumed there is not disagreement among the authorities. There is. Perhaps *Norton* v. *Shelby County,* 118 U. S., 425, 6 Sup. Ct., 1121, 30 L. Ed., 178, is most relied on as sustaining the contrary doctrine. In that case the legislature of Tennessee had undertaken, by statute, to constitute for the county of Shelby a board of commissioners to be appointed by the Governor, and clothe it with all the powers and duties then possessed by the quarterly court of the county, composed of the justices of the peace who had been elected by the people. This county court was one

of the institutions of the State, recognized in the Constitution. County commissioners were wholly unknown to the Constitution, and theretofore to the laws. There was no acquiescence by the justices or the people; on the contrary, there was immediate and continued public opposition, by suit and otherwise, on the part of the justices and others until the final disposition of the case. Meantime, in the face of the opposition and the litigation, the board subscribed to stock and issued railroad bonds of the county to the amount of about $29,000, and the liability of the county on these bonds was the subject of the suit. It must be apparent at a glance that we have before us no such case. In that case there was, according to the holding of the supreme court of Tennessee, no power in the legislature to authorize the appointment of county commissioners with such powers, by any form of statute, while in our case the power to create a board of city commissioners for Akron is unquestioned, and, if the proper classification has been prescribed, no one doubts that it is a board *de jure*. As against protest and objection from the start in the Tennessee case, we have in our case universal assent and acquiescence on the part of everybody for years.''

In *State* v. *Bailey*, 106 Minn., 142, 118 N. W., 678, 19 L. R. A. (N. S.), 777, the court says:

''Courts, in attempting to adhere to the abstract rule that there must in all cases be a *de jure* office, have in cases where a *de facto* corporation has been held to exist invented a theory of potential existence to take the place of the lawfully created office. [Citing authorities.]

There can, however, be no difference in point of substance between an office having a potential existence—i. e., one that might lawfully be created—and one existing in fact though not legally created. In neither case is it a *de jure* office. This precise question was discussed by the Missouri Court of Appeals in *Adams* v. *Lindell,* 5 Mo. App., 197, where the court reached the conclusion, as we think correctly, that the existence of a *de jure* office is not in all cases indispensable to the existence of a *de facto* officer. If this is not sound, then there can be no such thing as a *de facto* corporation or a *de facto* court. *Burt* v. *Winona & St. P. R. Co.,* 31 Minn., 472, 18 N. W., 285, 289.

"This court has held, and we are supported by courts of high standing, that there may not only be *de facto* municipal corporations, but *de facto* courts, and that the validity of their acts cannot be questioned in collateral proceedings. [Citing numerous authorities.]"

The court further said, quoting from *Burt* v. *Winona & St. P. R. Co.,* supra:

"Taking even the narrowest definition of an officer *de facto,* viz., that he is one who is exercising the duties of an office under color or legal right to the office, the reasons that justify the doctrine apply with equal force to a court or office where the same may be said to exist under color of right—that is, under color of law."

In *Lang* v. *Bayonne,* 74 N. J. Law, 458, 68 Atl., 92, 15 L. R. A. (N. S.), 101, 122 Am. St. Rep., 391, 12 Ann. Cas., 96, the court, speaking through Chief Justice GUMMERE, says:

"Notwithstanding the great weight which the opinion of so distinguished a jurist carries with it, notwithstanding that *Norton* v. *Shelby County,* 118 U. S., 425, 6 Sup. Ct., 1121, 30 L. Ed., 178, has been frequently cited with approval in other jurisdictions, I am unable to accept as sound the doctrine upon which it is rested, namely, that an unconstitutional law is void *ab initio,* and affords no protection for acts done under its sanction. That it works injustice in its application to the citizen is apparent.. The *Flaucher Case,* 56 N. J. Law, 244, 28 Atl., 82, is a pregnant example of the truth of this assertion. The legislature had enacted a general law making the unlicensed sale of intoxicating liquor a criminal offense, but legalizing such sales when made by a person holding a license from the proper authority. It then, by a subsequent statute, created the county board of license commissioners the proper authority to grant such licenses in the county of Camden. Flaugher applied to, and received from, this board a license to sell liquors at his saloon in the city of Camden. At that time the law creating the county board stood upon the statute book, apparently as valid, as much entitled to be respected and obeyed as the enactment which prohibited the sale of liquor without a license. And yet, notwithstanding that he scrupulously observed the law, as declared by the legislature, he was made a criminal by judicial decision, a decision which in its operation and effect was as much *ex post facto* as any statute which makes criminal an antecedent act which violated no law at the time it was done. The vice of the doctrine of *Norton* v.. *Shelby County,* 118 U. S., 425, 6

Sup. Ct., 1121, 30 L. Ed., 178, as it seems to me, is that it fails to recognize the right of the citizen which is to accept the law as it is written, and not to be required to determine its validity. The latter is no more the function of the citizen than is the making of the law. Each of these functions has been delegated by the Constitution, the one to the judicial and the other to the legislative branch of the government. And it is to be observed that the judicial function of determining the validity of statutes is confined within a very narrow scope. Courts are not vested with the general supervision of legislation. They have received no authority from the people to inspect each statute as it comes from the hands of the legislature and declare whether or not it infringes constitutional limitations. The function of the judicial department with respect to legislation deemed unconstitutional is not exercised *in rem*, but always *in personam*, *Allison* v. *Corker*, 67 N. J. Law, 596, 52 Atl., 362, 60 L. R. A., 564. Only such statutes as affect the rights of parties to judicial proceedings are ever subjected to the scrutiny of the courts, and these are comparatively few. Of the 2400 and more acts of the legislature passed in this State during the last ten years, less than 400 have received judicial consideration. The remaining 2,000 which are upon the statute book (except those which have been repealed by the legislature) are accepted and enforced as a part of the law of the land. And this, in my judgment, is the only way in which a government such as ours can be safely administered. To require the citizen to determine for himself, at his peril, to what extent, if at all, the legislature has over-

Beaver v. Hall.

stepped the boundaries defined by the Constitution in passing this mass of statutes, would be to place upon him an intolerable burden, one which it would be absolutely impossible for him to bear—a duty infinitely beyond his ability to perform. In my opinion, the provisions of a solemn act of the legislature, so long as it has not received judicial condemnation, are as binding upon the citizen as is the judgment of a court against him so long as it remains unreversed.''

And in the note to *Howard* v. *Burke,* 140 Am. St. Rep., 186, the editor, in referring to the cases of *Lang* v. *Bayonne* and *Norton* v. *Shelby County,* says:

''It is interesting to note that both Justice Field and Chief Justice Gummere seek to draw authority for their decisions on the point involved from the same source— *State* v. *Carroll,* 38 Conn., 449, 9 Am. Rep., 409. A careful reading of the opinion in that case and the searching analysis of it by Chief Justice Gummere, will, we think, make it clear, as said by Spear, J., in *State* v. *Pooler,* 105 Me., 224, 134 Am. St. Rep., 543; 74 Atl., 119, 24 L. R. A. (N. S.), 408, that the whole intention of this masterly resume by Chief Justice Butler is in support of the contention declared in *Lang* v. *City of Bayonne,* 74 N. J. Law, 455, 122 Am. St. Rep., 391, 68 Atl., 90, 15 L. R. A. (N. S.), 93, 12 Ann. Cas., 961.''

It will be noticed that in the said case of *Norton* v. *Shelby County,* Mr. Justice Field states that public policy made it necessary for the court to recognize the validity of acts of *de facto* officers. It seems to us that this same public policy makes it necessary to recognize the proceedings of courts created by the legislature

142 Tenn.—28.

where the legislature has the power to create such courts, where such courts have the color of legality and regularity, and where their acts and proceedings are acquiesced in by the public and are not objected to by the relators.

During the two years in which the criminal court of Tipton county existed it tried many cases. Can it be said of those who were tried and acquitted that, where the statute of limitation has not intervened, or even where they were convicted and have served a jail sentence, they can now be indicted in the circuit court of Tipton county and convicted again for the reason that all former proceedings were an absolute nullity? Can the sheriff who incarcerated defendants by virtue of *mittimuses* issued to him by said court be held liable for false imprisonment because everything done by said court was absolutely void?

In the case of *State of Tennessee* v. *Clint Tipton,* referred to above, in which we held chapter 563 of the Act of 1917 unconstitutional, counsel for the defendant alleged that the act creating the office of county judge of Tipton county and all acts amendatory thereof were unconstitutional. It was not necessary for us to pass upon that question in disposing of the case. The county judge of Tipton county had divorce jurisdiction, and in the exercise thereof has tried many divorce cases. Many of the litigants to whom he has granted divorces have remarried and children have been born to them; yet, if the act conferring jurisdiction should be declared invalid, and the contention made herein that a court created by an unconstitutional statute is a nullity, and

Beaver v. Hall.

that its proceedings are void *ab initio* and afford no protection, impose no obligations, and create no benefits, should be sustained, all persons who have obtained divorces in the court organized under such act and have remarried would be guilty of bigamy, and their children would be illegitimates.

The relators in the instant case have violated the law of the land. They were convicted by a jury of their peers. The highest court of the State has held that this conviction was warranted under the law and the evidence. If the relators are released, they will escape the punishment that the courts have said should be meted out to them. We believe that the same consideration of public policy that led the courts to adopt the *de facto* doctrine as a means of protecting the rights of the public who deal with officers acting under color of authority should be invoked in this case to protect the acts of a tribunal organized under an act of the legislature, apparently valid, until there has been a judicial determination of the invalidity of such a court. We are unable to see how such a holding could work any hardship. To hold otherwise might result most disastrously.

The judgment of the lower court discharging the relators will be reversed.